Anni GOODMAN and James A. Goodman, her husband, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 70–248 Civ. T.

United States District Court, M. D. Florida, Tampa Division.

March 9, 1971.

Anni Goodman, pro se.

Alan C. Todd, Asst. U. S. Atty., Orlando, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER

### Preliminary Statement

KRENTZMAN, District Judge.

This is an action brought pursuant to the Federal Tort Claims Act. 28 U.S.C. § 2672 et seq.

Plaintiffs in this action are Mr. James A. Goodman, his wife, Mrs. Anni Good-

man, and their minor child, Linda Ellen Goodman. The claims of one other plaintiff, Steve Goodman, have previously been dismissed from this action, there being no presentation of his claims to the appropriate federal agency either alleged or proven. 28 U.S.C. § 2675. Plaintiffs have proceeded in this case without representation of counsel. At no time did plaintiffs seek Court appointed counsel until the action was in the process of being tried. The Court at that time denied the request which was presented through a pleading or motion styled "Final Requisition." A full discussion of the parties to this action, and a history of the litigation sheds considerable illumination upon the case.

Plaintiff, Anni Goodman, was the primary force in pursuance of this claim. She presented her own claims and those of her minor children. The complaint was originally filed in Orlando, Florida, on March 16, 1970. At plaintiffs' request the only Federal District Judge resident in the Orlando Division of the Middle District of Florida, recused himself from the case. The Chief Judge of the Middle District of Florida assigned the case to the undersigned on June 22, 1970. Several motions were filed both by plaintiffs and by defendant, and these motions were heard by the Court at Orlando on August 6, 1970. All then pending motions were disposed of by order dated September 23, 1970, except defendant's motion to strike. The Court deferred ruling upon that motion until evidential matters relevant to the motion could be heard at the time of trial. The action was set for nonjury trial in Orlando on November 9, 1970, and was later continued until November 12, 1970. Trial commenced as scheduled. Under the circumstances, it was impossible to accomplish a meaningful or effective pretrial, and neither party had been able to give the Court an estimate of the trial time required. Each time one fact was presented, plaintiffs suggested the need for additional witnesses. Mindful of Rule 43(c), Federal Rules of Civil Procedure, and to allow plaintiffs to have a full

hearing, the Court was very liberal in receiving evidence. As a result, the total trial time was much greater than ever expected. Plaintiffs chose to subpoena several of their witnesses for the afternoon of November 13. Due to prior commitments in Tampa, the Court could not stay in Orlando for the afternoon of November 13. For this reason, and because some of defendant's witnesses were from out of state or were professional people, the Court heard several defense witnesses out of order. Plaintiffs offered no objection to this procedure at the time, although subsequently some dissatisfaction was expressed.

Due to the conflicts in the Court's schedule and since the case had not been completed, continued trial of the action was set for December 2, 1970, in Orlando. Once again several of plaintiffs' witnesses were subpoenaed for a later date, to wit, December 3, 1970. Since all of the witnesses had not been heard, and the Court had conflicts on December 3, the continued trial was once again reset, this time for January 14, 1971. It was in the interim between December 3, 1970, and January 14, 1971, that plaintiffs first requested appointment of counsel through a pleading or motion styled "Final Requisition."

The Court denied the request for appointment of counsel in an order dated January 4, 1971, for the reasons set out therein. On January 12, 1971, plaintiffs filed a pleading or motion styled "Writ of Right." The Court treated the "writ" as a motion to proceed in forma pauperis. Before further testimony was taken on January 14, Mrs. Goodman signed an affidavit supporting the motion, and the Court granted plaintiffs leave to proceed in forma pauperis. Plaintiffs had served several subpoenas upon prospective witnesses for January 14th, prior to the Court's granting the above motion. None of these subpoenas were accompanied by witness or mileage fees. Most of the witnesses so subpoenaed appeared on the morning of January 14. Several moved to quash the subpoenas. Most agreed to testify voluntarily. As to two of the

witnesses who would not appear voluntarily, the Court granted plaintiffs' oral motions for issuance of subpoenas at government expense. The witnesses did then appear and testify. As to other witnesses who did not voluntarily appear, the Court denied oral motions for issuance of subpoenas at government expense, there being an inadequate showing that the testimony of said witnesses would be indispensable to prove plaintiffs' claim for relief, or that the testimony would be relevant.

The trial continuation commenced as scheduled on January 14th, and continued into the afternoon of January 15th, whereupon both parties rested. Each party has filed memoranda which serve as final arguments and summations.

Plaintiff Anni Goodman is 44 years old. She was born in Finland, and was apparently captured by the Germans during World War II and put to work as a slave laborer. She met plaintiff James A. Goodman while he was in the army stationed in Germany. Mrs. Goodman is now an American citizen. Some testimony was presented and exhibits introduced showing that Mrs. Goodman is a woman of good moral character. See plaintiffs' Exhibit 18. Mrs. Goodman is obviously devoted to her family and vitally concerned for the welfare of her children and her husband. Several statements of doctors which have been placed in evidence indicate that Mrs. Goodman has at times had more success in caring for her daughter Linda than have the doctors themselves. See for example plaintiffs' Exhibits 7, 20, 21, 23, and 62. Mrs. Goodman has the approximate equivalent of a junior college education. She speaks three languages and is evidently musically inclined. It is also evident that while Mrs. Goodman speaks, writes and reads the English language, she is somewhat limited in her understanding of medical and legal procedures. As a result, Mrs. Goodman attempts to attribute consequences which simply do not follow from the facts. For example, when this case was filed in the Orlando Division of the Middle District of Florida, it was assigned an Orlando case number by the Clerk. When it was assigned to the undersigned, the Clerk in Tampa gave a Tampa Division case number to the cause. Mrs. Goodman has shown considerable consternation with this situation. She quickly filed a "motion to remove dual identity." The Court heard plaintiffs' argument on the motion in Orlando on August 6, 1970, and denied the motion. Mrs. Goodman expressed displeasure with what she calls the dual identity of this cause on several subsequent occasions, including her "trial memorandum" wherein it is stated that the dual number caused much confusion. The Clerk of the Court in Tampa assigned a Tampa case number to this case for reasons of convenience only. The Court has placed no significance upon the so-called "dual identity" and it is obvious that there simply is nothing of any consequence in the fact that the case was twice assigned numbers. The foregoing discussion is included to illustrate the difficulty Mrs. Goodman has in understanding court procedure and accepting explanations relating thereto.

The following example is further illustrative of Mrs. Goodman's inability or unwillingness to understand matters normally understood by persons with more experience in this country. Throughout the pendency of this litigation the Court has been assisted by one of its law clerks, Mr. Steven Pfeiffer. Mrs. Goodman has on several occasions been in contact with the Court through Law Clerk Pfeiffer. When Mrs. Goodman expressed displeasure with rulings of the Court or the status of this case, at the direction of the Court Mr. Pfeiffer would suggest that she either file a motion setting out her difficulties or note her differences with the Court in the record. Given the fact that plaintiffs are proceeding pro se in this action, Mr. Pfeiffer's instructions were both sound and proper. In her "Trial Memorandum" Mrs. Goodman has expressed some distrust of Mr. Pfeiffer and states that she did not find out until the conclusion of the case that Mr. Pfeiffer was the Court's clerk rather than the Court's

legal advisor. Mr. Pfeiffer has done nothing to poison the court's attitude toward Mrs. Goodman as suggested in plaintiffs' trial memorandum. Mrs. Goodman has harped on Mr. Pfeiffer's title —Law Clerk—has concluded that Mr. Pfeiffer is not a legal advisor, and has drawn inferences from that conclusion that are without foundation. This sort of unfortunate and senseless misunderstanding has been typical throughout this case. While such instances of misunderstanding have occasionally caused inordinate and unnecessary delay in the trial of this case, the ultimate presentation of evidence has not been adversely affected. However, the credibility of Mrs. Goodman as a witness on her own behalf and on behalf of the other plaintiffs is affected since it is obvious that Mrs. Goodman's understanding of events in her life is colored by her tendency to draw erroneous and often incredible conclusions and inferences from matters of no significance.

Plaintiff James A. Goodman is 44 years old. Mr. Goodman served in the United States Army long enough to retire. During his military career he served primarily as a cook. He attained the rank of sergeant.

Plaintiff Linda Ellen Goodman is a minor child. She is now thirteen years of age. According to the testimony of Dr. Theodore Dippy, Medical Director at the United Cerebral Palsy Clinic in Orlando, Linda suffers from cerebral palsy and at the time he examined Linda she had an approximate I.Q. of between 50 and 60. Dr. Dippy examined Linda in approximately May, 1964. See plaintiffs' Exhibit 62. Dr. Charles H. Carter, Medical Research Director at Sunland Hospital in Orlando, examined Linda in December, 1965. Dr. Carter described the child as semi-ambulatory. He placed Linda's mental level at approximately twelve months and stated that the child was a severe epileptic. See plaintiff's Exhibit 60. Dr. Keith L. Hansen, a private physician who presently serves as the Goodmans' family physician, testified that Linda's condition could be mildly improved. Linda appeared before the Court on two occasions. It is clear that Linda is not now a normal child, if she ever was.

### Claims Presented

The Court has jurisdiction of this case and over these parties under the provisions of 28 U.S.C. § 1346(b) and under the Federal Tort Claims Act. Plaintiffs have raised through their pleadings and additional allegations made at trial numerous claims for which they assert they are entitled to relief. It is clear that only three of these claims have been presented to the appropriate administrative agency as required by the provisions of the Tort Claims Act. 28 U.S.C. § 2675(a); Peterson v. United States, 428 F.2d 368 (8 Cir. 1970); Claremont Aircraft, Inc. v. United States, 420 F.2d 896 (9 Cir. 1969). The only evidence of presentation of claims to an administrative agency is embodied in plaintiffs' Exhibit 31. The claims presented include injuries allegedly sustained by plaintiff Anni Goodman while she was undergoing child birth in a military hospital at Fort Benning, Georgia in March, 1957; injuries allegedly sustained by plaintiff Linda Ellen Goodman during child birth in March, 1957; and injuries sustained by plaintiff Anni Goodman while she was being operated upon in a military hospital in Orlando, Florida, in October, 1967. These claims having been denied, and plaintiffs having brought this action within the time set out in 28 U.S.C. § 2675(a), the claims are ripe for a judicial determination upon their merits. There being no evidence of presentation of any other claims to the appropriate agency, they should be, and are hereby, dismissed.

Among the additional claims presented is a claim on behalf of plaintiff James A. Goodman. The precise nature of Mr. Goodman's claims have not been specified, but it can be presumed from the record that Mr. Goodman is seeking damages for injuries allegedly sustained collaterally to those of his wife and his minor child, Linda. He has allegedly

suffered gravely due to the negligence of the government in delivering his child, Linda, and in operating upon his wife. He alleges that he has lost the services of his daughter, his wife's consortium, and has had to pay medical bills in connection with the injuries sustained by his wife and daughter. He has furthermore allegedly suffered ridicule, condemnation and humiliation due to the government's negligence. There being no proof of presentation of this claim to the appropriate administrative agency, the claim must fail. However, since the Court heard considerable testimony relative to the claims, further discussion is appropriate. It is obvious that Mr. Goodman in order to recover must show a causal connection between his injuries and some action of the federal government. If no negligence is demonstrated then Mr. Goodman cannot recover. In this case if there is a failure of proof of negligence on the part of the government in connection with injuries sustained by plaintiffs Anni Goodman and Linda Ellen Goodman, then Mr. Goodman has no recoverable claim. The discussion of the claims on behalf of plaintiffs Anni Goodman and Linda Ellen Goodman for which there has been an exhaustion of administrative remedies is set out hereinafter. The failure of these claims would mean that Mr. Goodman's claims would fail also.

Early in the trial of this cause the Court dismissed claims advanced on behalf of plaintiff Steve Goodman, the Goodmans' elder child. It is alleged that military hospitals refused to aid Steve when he had a broken nose despite Steve's entitlement to treatment. Some evidence was presented that Steve did in fact have a broken nose, see plaintiffs' Exhibit 29. Mrs. Goodman testified that the nose is still broken and that the military has refused to treat it. The Court did not allow all testimony proffered relative to Steve's claims to be introduced since there was no showing of presentation of the claims to the appropriate agency. This failure bars the claim.

Here also it is appropriate, however, to note that in her testimony on other claims Mrs. Goodman made it clear that at a time prior to the injury to Steve she had lost faith in government medical facilities and would not let her children use them. Mr. Goodman joined in this position.

■ The Goodmans' additional claims relate to alleged conspiracy on the part of the government and diverse other parties including the telephone company in Orlando, the Medical Association in Orlando, the Bar Association in Orlando, a credit union in Orlando and various insurance companies, as well as individual doctors, lawyers, public officials and officers of insurance companies. Much of the testimony and other evidence proffered with respect to conspiracy on the part of persons other than the government was offered as evidence of conspiracy on the part of the government. Other evidence of such conspiracy was not alleged to have any connection with the government. Insofar as plaintiffs may have a claim for relief against parties other than the government, a suit under the Federal Tort Claims Act is not the appropriate avenue to pursue such a claim. Medical and legal associations, the telephone company, insurance companies and others were not parties to this action, and were not in a position to respond to plaintiffs' allegations. Furthermore, federal jurisdiction has not been shown to exist as to any of these persons.

The alleged conspiracy on the part of the government is immensely broad in scope. Plaintiffs assert that the government has conspired to deny plaintiffs medical and legal services, has conspired to deceive plaintiffs by concealing the nature of medical services performed, has conspired to keep plaintiffs out of Court, and has conspired through the Post Office Department to censor plaintiffs' mail and misdeliver plaintiffs' mail. Plaintiffs allege that the scope of this conspiracy is so wide that government agents would interfere with non-government re-

lated activities of plaintiffs. For example, it is alleged that government agents coerced druggists into refusing to fill prescriptions for plaintiffs and threatened attorneys or doctors who expressed a willingness to assist plaintiffs. In respect to plaintiffs' claims relative to conspiracy there has been no evidence introduced that the claims have been presented to any administrative agency. The claims must therefore fail. 28 U.S.C. § 2675(a).

■ In this instance as in the instance of the claims of plaintiff, James A. Goodman, considerable testimony was taken and other evidence introduced relative to the claims. Since so much judicial time was spent on the conspiracy allegations further discussion is appropriate. At the outset it should be noted that there are grave doubts as to whether the conspiracy claims can be maintained against the United States under the provisions of the Tort Claims Act. Plaintiffs' conspiracy claims appear to be grounded on theories of fraud, deceit, and misrepresentation, as well as on miscarriage of mail. Actions for fraud, deceit and misrepresentation are specifically excluded from the ambit of the Tort Claims Act. 28 U.S.C. § 2680(h); Sanchez Tapia v. United States, 338 F.2d 416 (2 Cir. 1964), cert. den. 380 U.S. 957, 85 S.Ct. 1096, 13 L.Ed.2d 974; United States v. Croft-Mullins Electric Co., 333 F.2d 772 (5 Cir. 1964), cert. den. 379 U.S. 968, 85 S.Ct. 664, 13 L.Ed.2d 561; United States v. Gill, 156 F.Supp. 955 (W.D.Pa.1957). Even if a claim purports to be grounded in theories other than misrepresentation the exception set out in 28 U.S.C. § 2680(h) would bar the action if deceit or misrepresentation were a factor relied upon to maintain a suit. Kilduff v. United States, 248 F.Supp. 310 (E.D.Va.1960). Actions based on miscarriage of mail are also specifically excluded from the ambit of the Tort Claims Act. 28 U.S.C. § 2680 (b).

■ Assuming but not deciding that plaintiffs' claims against the government sounding in conspiracy could be maintained in view of the above provisions, these claims have not been proven, and are refuted by the evidence presented in this case. In attempting to prove a conspiracy on the part of the United States Government, plaintiffs introduced numerous exhibits, testified on their own behalf and called several witnesses to the stand. Only the uncorroborated testimony of plaintiffs James A. Goodman and Anni Goodman supports the existence of any conspiracy. Mrs. Goodman testified that government agents threatened or coerced several attorneys in order to prevent the attorneys from representing the Goodmans. She further testified that the Grievance Committee of the Ninth Judicial Circuit of Florida had blacklisted the Goodmans apparently due to some pressure being exerted by the government. Norman F. Burke, an attorney at law practicing in Orlando, Florida, and Chairman of the Grievance Committee of the Ninth Judicial Circuit, properly refused to answer any questions relative to proceedings before the Grievance Committee. He did, however, testify that the committee has no policy of blacklisting people from representation, and that in fact the rules of The Florida Bar set up a contrary policy. The Court specifically finds that the evidence in this case does not support any inference of blacklisting and that if any blacklisting could remotely be conjured from the evidence, that there is no evidence whatever connecting the government with any such conduct.

Attorney Michael Maher, who practices in Orlando was contacted by plaintiffs relative to this case. He testified that he was never contacted by any government agents, that he did not tell the Goodmans that he was approached by any government agents, and that he did not tell Mrs. Goodman that her citizenship papers were no good or that her case was so "high up" that Mrs. Goodman would never get into court. Attorney Maher testified that he recalled Mrs. Goodman saying that her life was in danger, but that he had no knowledge that this was true. Mr. Harry Brushwood, an investigator with the firm for

which Attorney Maher was employed when plaintiffs contacted him, testified that he was never contacted by any agent of the United States government or any legal or medical association relative to this case. Mr. Troy Musselwhite, Jr., an attorney practicing in Orlando, saw the Goodmans in February, 1970, relative to the possibility of his representing them in this action. Mr. Musselwhite testified that he decided not to take the case. He further testified that he was never threatened, coerced nor even approached by any agent of the government of the United States relative to his representing plaintiffs in this action. Attorney Charles Prather who practices with Attorney Musselwhite and saw the Goodmans at the same time and for the same reasons as did Attorney Musselwhite, testified that he was never approached, coerced or threatened by any agent of the government relative to this case. Based on this evidence the Court rejects any contention that the government of the United States engaged in a conspiracy to prevent the Goodmans from attaining representation in this action.

Mrs. Goodman testified that the government of the United States engaged in a conspiracy and exercised coercion and threats in support of the conspiracy in order to prevent plaintiffs from attaining medical treatment and services. None of the ten physicians who testified in this case indicated that they participated in such a conspiracy, or were aware of such a conspiracy or were contacted, coerced or threatened by any agents of the United States government relative to providing medical treatment for the Goodmans. The following physicians directly testified that they were in no way improperly approached by any government agents, or coerced in any way relative to their treatment of the Goodmans: Dr. Charles W. Fowler, III, Dr. James B. French, Dr. Charles H. Carter, Dr. Keith L. Hansen, Dr. Theodore Dippy, Dr. William L. Jennings, and Dr. Ronald M. Wilson. In view of this overwhelming evidence, and in view of a complete absence of any evidence corroborative of Mrs. Goodman's testimony, the Court specifically finds that the government has not engaged in a conspiracy to prevent plaintiffs from attaining medical treatment.

Among the governmental agencies alleged to have participated in the conspiracy is the Post Office Department. Mrs. Goodman alleged that all of her mail was censored and testified that small numerals were placed on the back of all mail coming to the Goodman residence. She maintained that these numerals reflect censorship. She introduced into evidence a deposition taken of a former neighbor of the Goodmans, one Mary Lou Merritt. See plaintiffs' Exhibit 30. This deposition was conducted by Mrs. Goodman, with no government counsel present. Mrs. Goodman stated that the Assistant United States Attorney who was then representing the government in this action, was properly notified of the taking of the deposition. In any event, the only remotely relevant or material evidence that can be deduced from the deposition is that apparently Mary Lou Merritt's incoming mail had numerals on the back of envelopes similar to those on the Goodmans' incoming mail. Assuming, but deciding to the contrary, that small numerals on envelopes of incoming mail would serve as proof that mail was censored, and that this was done in furtherance of a broader conspiracy, the explanation offered by Mr. Wayne R. Richie, a postal inspector for the United States government is far more logical than the explanation urged by Mrs. Goodman. Mr. Richie testified that mail sorting techniques now in use frequently involve the use of numbers. Mr. Richie did not testify that this was the case in this instance. He testified that he did not know why the numerals were placed on mail incoming to the Goodmans' residence. He testified further that the Post Office has no device which would pick up mail by addressee.

Mrs. Goodman alleges that the Post Office has failed to deliver certain of her letters to the addressee as set out on her letters, despite the fact that the letters

were sent registered mail and clearly marked to be delivered only to the addressee. Among the addressees of these letters were the President of the United States, the Secretary of State, the Attorney General, and various United States Senators. Return receipts from several of these letters showing that they were accepted by someone other than the addressee were introduced into evidence. Plaintiffs' Exhibits 54, 55. The explanation of this occurrence offered by Postal Inspector Richie and reflected in plaintiffs' Exhibit 56, is reasonable, wholly believable, and so obvious as to be within the realm of common knowledge. Plaintiffs' Exhibit 56 is a letter addressed to "Mrs. Ann Goodman," and dated February 16, 1970. The letter is signed by W. J. Cotter, Chief Postal Inspector of the Post Office Department. Set out in the letter are postal regulations relating to restricted delivery of registered mail. One of these regulations deals specifically with registered mail addressed to officials of executive agencies, or members of the legislative and judicial branches of the government of the United States. The regulation authorizes delivery of articles sent as restricted registered mail to such addressees to be made either to the addressee or to the person he authorizes to receive his mail. While perhaps not ideally perfect, the wisdom of such a regulation is obvious. If the President or other governmental officials were required to personally receipt for articles of mail from every person who may seek action by the official, the inevitable result would be that high governmental officials would spend all of their time receipting for mail. Mrs. Goodman is unwilling or unable to accept and comprehend this fact. The Court finds that there is no credible evidence that the government of the United States conspired against plaintiffs through the Post Office Department.

Allegations of other conspiratorial actions were made by plaintiffs at trial. The Court finds that none are supported by the evidence. Evidence received which can only be construed as relevant to allegations of conspiracy includes plaintiffs' Exhibits 4, 24, 28, 32, 52, 59, 66, and 67. Additional witnesses whose testimony could only be considered relevant to issues of conspiracy include Mr. James Moore, Mrs. Randi Mixer, and State Senator William Gunter. The Court has considered all testimony and exhibits and has listened to the tape recording designated Plaintiffs' Exhibit 66. Nothing in any of the exhibits or testimony supports any inference of a conspiracy on the part of the government or anyone else.

### Linda Ellen Goodman's Claims

Plaintiffs allege that plaintiff Linda Ellen Goodman was severely injured during child birth in March, 1957. Linda was born in a military hospital at Fort Benning, Georgia. Plaintiffs allege that while child birth was occurring, and Linda was partially protruding from Mrs. Goodman's womb, employees of the military hospital negligently caused Mrs. Goodman to fall from the table upon which she was placed. It is alleged that this traumatic incident caused brain damage to the child and has resulted in the difficulties described above. Before the evidence in support of these allegations is discussed, there are some preliminary considerations. The statute of limitations on federal tort claims is two years. 28 U.S.C. § 2401(b). Plaintiffs may not have become aware of the nature of Linda's injuries until sometime after March, 1957, however, the evidence supports the conclusion that this claim for relief accrued long before a date two years prior to the filing of claim to an administrative agency upon which this action must depend. In fact, the Goodmans brought an action in Federal District Court in the Western District of Texas in 1959 on behalf of Linda for the very injuries alleged in this action. See defendant's Exhibit 1 and plaintiffs' Exhibits 22, 37 and 39. Plaintiffs and the government settled this claim, and guardianship proceedings were initiated in Texas state courts pursuant to the practice in Texas. See defendant's Exhibits

1 and 2, and plaintiffs' Exhibits 37, 39, 33, 34 and 38.

■ Plaintiffs now maintain that they should be relieved from the judgment in the Texas case because it was procured by means of coercion, duress and fraud. Rule 60, Federal Rules of Civil Procedure, provides for relief from a judgment for reasons of fraud, misrepresentation or other misconduct of an adverse party. Under the provisions of the rule, a motion for relief from judgment must be filed within one year after the judgment was entered. The relief from judgment which the plaintiffs seek is clearly not undertaken pursuant to Rule 60, since the motion is not directed to the Court which entered the judgment. Assuming but not deciding that an independent action could be initiated in a district court for relief from the judgment of another district court for reasons of fraud or other misconduct, some ten years after judgment was entered, the proof of fraud or other misconduct in this action is insufficient.

Plaintiffs suggest that the government resorted to violence to coerce settlement of the tort claims action in the Western District of Texas. It is alleged that shots were fired into the Goodmans' home and that the Veterans Administration initiated foreclosure proceedings against the Goodmans, all for the purpose of coercing settlement of the Texas action. It is further alleged that attorneys representing the Goodmans in the Texas tort claims suit and in subsequent guardianship proceedings engaged in misconduct in order to force settlement of the cause. The only evidence supporting these allegations is the uncorroborated testimony of Anni Goodman and James A. Goodman. The attorneys who pursued the Texas case for plaintiffs were subpoenaed and testified at the trial of this action at the government's expense. James C. Brady, an attorney now practicing in Houston, Texas, filed the tort claims action on behalf of the Goodmans. The complaint was filed on February 3, 1959, and the action was concluded some two years later. Mr. Brady testified that the settlement was negotiated because while he felt that the damages were insufficient, the proof of liability was weak. Brady further testified that the judge to whom the case was assigned did not "favor" tort claims. Mr. Brady recalled that the Goodmans were reluctant to settle, but he stated that he exercised no force or coercion in getting them to settle, nor did he know of any force being exercised by anyone else. Attorney William J. Salyer represented the Goodmans in the Texas guardianship proceedings. He now practices law in San Antonio, Texas. Mr. Salyer recalled several instances in which he had difficulty communicating with Mrs. Goodman, and getting her to understand the nature of the proceedings. Mr. Salyer testified that he used no force against the Goodmans, that he knows of no force being exercised, and that the Goodmans made no claim at that time that they had been coerced in any manner. Anni Goodman and James A. Goodman testified concerning numerous incidents during and after the pendency of the Texas action. This testimony is the only relevant or material evidence favoring plaintiffs on the issue of fraud. The Court concludes that the evidence is not sufficient to warrant a reopening of the matters raised and finally settled in the Texas action. The Court finds that case No. C.A.2725 in the Western District of Texas is *res judicata* of the claims advanced in this action on behalf of Linda Ellen Goodman. The government's motion to strike from the pleadings herein claims relating to Linda Ellen Goodman, which the Court previously deferred ruling upon, should be and is, granted.

■ Here again the Court heard considerable testimony, and numerous exhibits were introduced relative to the merits of the claims of Linda Ellen Goodman. The Court has considered the evidence and concludes that, assuming the judgment in the Texas case is vulnerable to the attack levied, and that the proof were sufficient to warrant reopening the Texas case, the evidence does not support plaintiffs' allegations that a trau-

matic incident occurred during the birth of Linda Ellen Goodman, and that this incident caused Linda's retardation, epilepsy and cerebral palsy. Mrs. Goodman testified at length about the accident which she alleges occurred. Several statements in the medical records introduced into evidence support the conclusion that trauma caused Linda Ellen Goodman's troubles. See plaintiffs' Exhibits 8, 19, 43, 46 and 47. The testimony of some of the physicians who testified would indicate that the injuries could have been caused by trauma at birth. Plaintiffs' Exhibit 7 was to the same effect. The only competent evidence with respect to the occurrence of an accident while Mrs. Goodman was in child birth with Linda Ellen is the unsupported testimony of Mrs. Goodman. Attorney Brady testified as to his belief that the accident did occur and that it caused Linda to be retarded. However, he testified that he was unable to find, after visiting the hospital in Georgia, any witnesses to the alleged incident. His attempts to locate persons who were patients at the same time as Mrs. Goodman did not uncover any witnesses. See plaintiffs' Exhibit 44. As to the statements contained in medical records to the effect that Linda's infirmities were caused by trauma at birth, several of the medical witnesses testified that a physician generally accepts a mother's explanation of the cause of a child's injury. These records therefore reflect a parroting by the physician of the history recited by the mother. None of the doctors who testified could say for sure what caused the damage. None of them ruled out the possibility of trauma but numerous other equally likely causes were cited. The testimony of Doctor Charles H. Carter and Doctor Theodore Dippy is particularly illuminating in this respect. The only evidence directly supporting the happenings of an accident during child birth and the connection between this accident and Linda's troubles is the testimony of Mrs. Goodman. The Court finds that the evidence is insufficient to support any negligence on the part of the government and further, if there was any negligence, finds no causal connection between the act and the injury.

### The Claims of Anni Goodman

■ Other than those already discussed by the Court, Mrs. Goodman makes two additional claims. First it is alleged that she was injured in the same alleged fall described above in relation to the claims of Linda Ellen Goodman. Secondly it is alleged that employees of a military hospital in Orlando negligently performed an operation upon Mrs. Goodman in October, 1967. Mrs. Goodman has alleged that her injuries from these two incidents are connected in that the defendant's agents concealed the results of the 1957 fall, and attempted to permanently hide injuries sustained in the 1957 fall through the 1967 operation. This allegation is totally unsupported by the evidence. None of the physicians involved in the 1967 operation testified to this effect, and aside from Mrs. Goodman neither did any other witness.

Mrs. Goodman's claims stemming from the alleged 1957 fall are clearly barred by time. See the discussion of the Statute of Limitations in actions under the Federal Tort Claims Act, previously set out. No concealment has been shown. The evidence supports the conclusion that any claims arising out of the alleged 1957 fall accrued at the time of the fall, and the Court so finds. Even if the Statute of Limitations had not expired and barred this claim, the Court has found that insufficient evidence has been offered to prove that a fall or other accident occurred while Mrs. Goodman was in child birth. Furthermore, no injuries have been shown to have resulted even if the fall did take place. Plaintiffs have introduced several x-rays taken of Mrs. Goodman between 1965 and 1967. It is alleged that these x-rays show that Mrs. Goodman had a broken pelvis and various spine injuries. Plaintiffs' Exhibits 1, 2, 65. No expert witnesses were called by plaintiffs to read these x-rays at trial, but Exhibit 65 had been examined by Dr.

William L. Jennings, whose testimony is later discussed. In any event, there is absolutely nothing to connect injuries purported to be reflected in the x-rays to any action on the part of the government.

■ As to the claims stemming from the 1967 operation, Mrs. Goodman has exhausted her administrative remedies, and brought the action within the time prescribed. Mrs. Goodman alleges that agents of the government performed a hysterectomy upon her in October, 1967. It is alleged that this operation was unauthorized and unnecessary. It is further alleged that the physicians performing the surgery were guilty of malpractice, that the operation was negligently performed, and that Mrs. Goodman suffered grievous injuries as a result.

On the form authorizing the 1967 operation, the words "if cancer" appear before Mrs. Goodman's signature. Plaintiffs' Exhibit 17. Mrs. Goodman testified that the performing physicians did not explain the nature of the operation to her, and that she wrote the words "if cancer" on the form prior to going into surgery. Dr. James B. French who performed the surgery testified that he attempted to explain the nature of the surgery to Mrs. Goodman, and that he thought she understood and agreed. He testified that Mrs. Goodman was suffering from a stretched uterus and pelvic relaxation. Considering Mrs. Goodman's pre-operative symptoms, he had recommended a therapy of dilation and curettage of the uterus, which involves a scraping of the uterus and is known as a "D and C." If a culture of the scrapings was not malignant then a vaginal hysterectomy was to be performed.

Dr. James Vincent Werba and Dr. William L. Jennings, both of whom specialize in obstetrics and gynecology testified that given the pre-operative symptoms described by Dr. French, the procedures adopted by him were proper and appropriate. Dr. French and several of the other physicians testified that a vaginal hysterectomy would not have been appropriate if there was a malignancy.

Under such circumstances an abdominal hysterectomy is the proper procedure. The distinction between these categories of hysterectomy is that in the former the womb and uterus are removed through the vagina, while in the latter, the organs are removed through an incision made in the patient's abdomen. The Court finds that the procedure adopted by Dr. French, considering the symptoms he described, was proper under approved medical practice.

Mrs. Goodman vigorously maintains that she did not authorize the operation, relying on plaintiffs' Exhibit 17. It is evident that the hospital file on Mrs. Goodman disappeared from the hospital after the surgery. See plaintiffs' Exhibit 42. How this disappearance occurred remains a mystery. Mrs. Goodman did come into possession of the records by some means, and produced them at trial. Plaintiffs' Exhibit 17. The Court has carefully examined the authorization form, and it appears that the words "if cancer" were written with a different pen than was used on the rest of the form. It also appears that the words are not part of the sentence they follow. Mrs. Goodman had possession of this form and she had the opportunity to alter the authorization. Dr. French testified that the surgery would probably not have been performed had the authorization been signed as it now appears. He also testified that he does not read these forms but that someone else on the hospital staff handles them. If the form had been executed as it now appears, a patent absurdity arises, because if after performing the "D and C" a malignancy was not found, the vaginal hysterectomy could not be performed. If, however, a malignancy had been found, in which event a different type operation was indicated, then under the form authorization the vaginal hysterectomy could have been performed.

The evidence in this case does not support any misconduct, or negligence on the part of agents or employees of the government in connection with the authorization form, and whatever relevance the

form may have, it does not demonstrate malpractice on the part of the physicians.

Allegations that the surgery performed by Dr. French was done negligently, or that Dr. French was guilty of malpractice were refuted by the evidence. Physicians who have examined Mrs. Goodman since her surgery and who appeared at this trial, testified that they found no evidence that the surgery was performed negligently nor that there was any evidence of malpractice.

Dr. Werba, a private physician practicing in Orlando, specializes in obstetrics and gynecology. He testified that he has performed numerous hysterectomies. He was requested to examine Mrs. Goodman by an attorney, Mr. William Frederick, as an aid in determining if her injuries could give rise to legal action on her behalf. Dr. Werba examined Mrs. Goodman twice in May, 1968. He described his examinations as a complete physical. Dr. Werba found nothing wrong with Mrs. Goodman. He evaluated her condition as normal for a woman who had undergone a vaginal hysterectomy several months prior to the examination. Dr. Werba testified that it appeared to him that the operation was performed in a proper manner, and he stated that he found no evidence of malpractice. He testified that Mrs. Goodman did not complain of hip or spine problems, or a split uterus or of infections, and that Mrs. Goodman's ovaries were present when he examined her.

Dr. Joseph J. Williams, a private physician practicing in Orlando, also specializes in the fields of obstetrics and gynecology. He testified that he saw Mrs. Goodman approximately a dozen times starting in April, 1968, relative to her complaints of vaginal irritation. He testified that he found no abnormalities in the patient and that the hysterectomy appeared to him to have been performed in a proper manner. He found no evidence of malpractice. Dr. Williams testified that he did not determine whether or not Mrs. Goodman's ovaries were present and that there was no objective sign of infection. He testified that Mrs. Good-man complained of lower back problems but that he did not write down that she complained of hip troubles.

Dr. William L. Jennings is a private physician practicing in Ormond Beach, Florida. He specializes in obstetrics and gynecology. He testified that he has performed some 5,000 hysterectomies over a thirty year period. Dr. Jennings examined Mrs. Goodman twice in February, 1968. He testified that she came to him under a name other than Anni Goodman. Mrs. Goodman testified that she went to Dr. Jennings using her maiden name—Anni Sykiainen. Dr. Jennings testified that he recognized Mrs. Goodman as the lady who came to him under the name, Anni Sykiainen. He testified that Mrs. Goodman complained of lower quarter pain. He examined her, but could find no cause of pain or discomfort, nor could he find evidence of any abnormality whatever. He prescribed a relaxer. Dr. Jennings testified that x-rays were taken of Mrs. Goodman, and that they revealed nothing unusual. Dr. Jennings could find no ovaries in Mrs. Goodman, but he testified that it is always difficult to find ovaries in a woman as heavy as was Mrs. Goodman. He did find that her vagina was moist and he testified that this would indicate that ovaries were present and functioning. Dr. Jennings testified that he could find nothing wrong with the hysterectomy that had been performed.

Dr. Ronald M. Wilson is a private physician practicing in Orlando. He specializes in gynecology. Dr. Wilson was called to the stand by plaintiffs. He testified that he examined Mrs. Goodman in December, 1967. He described her condition at that time as good, having had recent surgery. Dr. Wilson testified that he assumed the surgery was a hysterectomy since the patient had no uterus or womb. He found no infection but stated that she had normal post-operative irritation.

Dr. James B. French performed the hysterectomy. At the time of the surgery in 1967 he was on active duty with the Air Force at the Orlando Air Force

Base Hospital as a medical doctor and surgeon. For approximately the past two and one half years he has been in private practice specializing in obstetrics and gynecology. He is a member of the American Board of Obstetrics and Gynecology and the American College of Obstetrics and Gynecology. He testified that he did not see Mrs. Goodman after she left the hospital, but that he did talk to her. He felt that her post-operative course was normal, there being only slight bleeding. He did not recall Mrs. Goodman screaming during the surgery. He did not recall that Mrs. Goodman complained of freezing after the surgery. He did not recall a needle being broken off in the patient's arm.

Many of the records of the physicians who testified and others who did not, were offered into evidence. See plaintiffs' Exhibits 9, 10, 11, 12, 13, 14, 15, 16, 17, 41, 42, 49, 63. None of these exhibits support allegations of negligence, malpractice or recoverable injury, and where they are relevant they corroborate the medical testimony.

Against this abundant evidence to the contrary, Mrs. Goodman testified that she suffers grievously due to the operation, that the operation was performed negligently, that her ovaries were unnecessarily removed, and that Dr. French was guilty of malpractice. Mrs. Goodman relies upon unknown doctors from Canada and unknown x-ray technicians from Ormond Beach to support her statements. These people were not subpoenaed and did not testify at trial. Based on the preponderance of evidence described above, the Court finds that the government's physicians who performed a hysterectomy on Mrs. Goodman in 1967 were neither negligent in doing so nor guilty of malpractice. The evidence does not support negligence on the part of any agents of the government in connection with the operation. The Court further finds that Mrs. Goodman suffers no recurring physical infirmities as a result of the operation.

## CONCLUSION

To summarize the findings herein, the Court finds as follows:

1. The Court has jurisdiction over the parties and over the cause of action.

2. As to plaintiff, Steve Goodman, there has been no showing of presentation of his claims to the appropriate administrative agency.

3. As to plaintiff, James A. Goodman, there has been no showing that his claims have been presented to the appropriate administrative agency, and if such a showing had been made, his claims are not supported by the evidence.

4. Assuming that plaintiffs' claims based on conspiracy are justiciable, there has been no showing that the claims were presented to the appropriate administrative agency, and if such a showing had been made, the claims are not supported by the evidence.

5. As to the claims advanced on behalf of plaintiff, Linda Ellen Goodman, the claims have been previously settled in an action maintained in the Western District of Texas, and that settlement is *res judicata* of all issues presented on behalf of Linda Ellen Goodman in this action. If the matters already litigated and settled could be reopened, the claims of Linda Ellen Goodman are not supported by the evidence.

6. As to claims advanced by plaintiff, Anni Goodman, arising from the alleged 1957 accident, the claims are barred by the statute of limitations. Even if they had been timely filed, the claims are not supported by the evidence.

7. As to claims advanced by plaintiff, Anni Goodman, arising from the 1967 operation, the claims are not supported by the evidence, and the evidence supports the conclusion that there was no malpractice or negligence involved in the 1967 operation.

The Court finds for the defendant on all claims presented in this action. It is the opinion of the Court that plaintiff should recover nothing and that each

party should bear its own costs incurred up until this time.

The foregoing shall constitute findings of fact and conclusions of law. Final judgment will be entered by the Court in accordance with the findings and conclusions.

## JUDGMENT

This action came on for trial before the Court, and the issues having been duly tried and a decision having been duly rendered, it is, therefore,

Ordered and adjudged:

The plaintiffs shall take nothing, and the action shall be dismissed on the merits, and each party shall bear its own costs.